# Exhibit 1

1  MAUREEN E. MCCLAIN (State Bar No. 062050)
   Email: mcclain@kmm.com
2  DANIELLE M. ELLIS (State Bar No. 226581)
   Email: ellis@kmm.com
3  KAUFF MCCLAIN & MCGUIRE LLP
   One Post Street, Suite 2600
4  San Francisco, California  94104
   Telephone:   (415) 421-3111
5  Facsimile:   (415) 421-0938

6  Attorneys for Defendant
   ALTA BATES SUMMIT MEDICAL CENTER

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  CHARLOTTE KIRTON,                          CASE NO.  CV 07-05863 MHP

12              Plaintiff,                     **DECLARATION OF DANIELLE M.
                                               ELLIS IN SUPPORT OF
13  v.                                         DEFENDANT'S MOTION FOR
                                               SUMMARY JUDGMENT, OR IN
14  ALTA BATES SUMMIT MEDICAL CENTER;          THE ALTERNATIVE, PARTIAL
    and DOES 1-20,                             SUMMARY JUDGMENT**
15
                Defendants.                    **DATE:**      June 2, 2008
16                                             **TIME:**      2:00 p.m.
                                               **COURTROOM:**   15, 18th Flr.
17                                             **JUDGE:**    Hon. Marilyn Hall Patel

18                                             **COMPLAINT FILED:** October 22, 2007
                                               **TRIAL DATE:** No date set.
19

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE  (415) 421-3111

1     I, Danielle M. Ellis, declare:

2          1.     I am an associate with the law firm of Kauff, McClain & McGuire,

3     LLP, attorneys of record for Defendants Alta Bates Summit Medical Center, in the

4     above-captioned matter. I have personal knowledge of the facts stated in this

5     declaration and, if called as a witness, would be competent to testify thereto.

6          2.     Attached hereto as **Exhibit A** is the relevant deposition testimony of

7     Plaintiff Charlotte Kirton submitted in support of Defendant's motion for summary

8     judgment or, in the alternative, partial summary judgment.

9          I declare, under penalty of perjury under the laws of the United States of

10    America that the foregoing is true and correct.

11         Executed this 28th day of April, 2008 at San Francisco, CA.

12                                          /S/
                                    DANIELLE M. ELLIS
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-1-

DECLARATION OF DANIELLE M. ELLIS IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT          CASE NO. CV 07-05863 MHP

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLOTTE KIRTON,



        Plaintiff,          Case No.: C 07-05863
                                    MHP

-vs-

ALTA BATES SUMMIT MEDICAL CENTER;
and DOES 1-20,

        Defendants.     **COPY**

_____

DEPOSITION OF CHARLOTTE KIRTON

MARCH 28, 2008

8:06 A.M.

Reported by:  LINDA VACCAREZZA, RPR, CRP, CLR,
               CSR NO. 10201

PREFERRED REPORTERS
CERTIFIED SHORTHAND REPORTERS
19229 Sonoma Highway, Suite 112
Sonoma, California 95476
Phone (707) 938-9227

1

1  terminated in December of 2005?

2  A  I believe I was making about 100 to

3  $150,000 a year.

4  Q  That's a big differential.

5  A  Yes. I know. I'm sorry.

6  Q  Which one is it?

7  A  I believe it was closer to the $150,000

8  a year mark.

9  Q  And solely from Alta Bates Summit

10  Medical Center?

11  A  Yes.

12  Q  And then you were making an

13  additional -- how much additional income were you

14  making at your other jobs?

15  A  Approximately, 50 to 60,000.

16  Q  So your total income was approximately

17  $200,000?

18  A  Approximately, 204,000.

19  Q  And you were still unable to pay your

20  taxes at that time?

21  A  Yes, and unable to pay all of them.

22  Yes.

23  Q  And Alta Bates Summit Medical Center

24  Summit campus name has changed over the years

25  that you've been employed; is that right?

1 1993. I may not be sure of the month. But I

2 believe it was 1993.

3    Q   Okay. Do you recall what your hourly

4 wage was at that time?

5    A   Initially, I think it was about $30 an

6 hour.

7    Q   Do you recall what your annual salary

8 was around that time?

9    A   No.

10    Q   $30 an hour, does anyone have any idea

11 what $30 an hour is per year?  Approximately,

12 $75,000 a year?

13    A   Approximately.

14    Q   So you've more than or approximately

15 doubled your income in the time that you've work

16 at Alta Bates Summit Medical Center; is that

17 right?

18    A   Yes.

19    **Q   Have you been promoted at Alta Bates**

20 **Summit Medical Center?**

21    **A   Promoted?**

22    **Q   Ever received a promotion?**

23    **A   Yes.**

24    **Q   How many promotions did you receive?**

25    **A   I believe I went from Staff Nurse I to**

00061

1  **Staff Nurse II.**

2  **Q   Okay.  One promotion?**

3  **A   Yes.**

4  Q   One promotion and doubling your salary.

5  Any other positive employment history that you

6  had at Alta Bates Summit Medical Center?

7  A   When you say "doubling my salary," what

8  do you mean?

9  Q   You testified earlier that your ending

10  salary was $150,000 a year and that your starting

11  salary was approximately $75,000 a year; do you

12  need to change your testimony?

13  A   No.

14  Q   Okay.  Do you understand what I mean by

15  "doubling your salary"?

16  A   Yes.

17  Q   Okay.

18  A   Is there a question?

19  Q   Yes.  Any other positive employment

20  history while you were at Alta Bates Summit

21  Medical Center?

22  MR. ETOH: Objection.  Vague as to the word

23  "positive."

24  BY MR. VANDALL:

25  Q   Did you enjoy working at Alta Bates

00075

1    A    Okay.

2    Q    You testified that the stated basis for

3    the harassment was the one phone call from

4    Jennifer Stroud, and then I asked you to confirm

5    that you did not mention any other phone calls,

6    jokes, comments or other harassing statements or

7    conduct in the complaint dated December 7, 2005,

8    to the Department of Fair Employment and Housing,

9    correct?

10    A    Correct.

11    Q    Okay.  Thank you.

12        You were terminated by Alta Bates Summit

13    Medical Center's predecessor in interest, the

14    Summit Campus or Summit Hospital, in September

15    1996, correct?

16    A    Yes.

17    **Q    Why were you fired in September of 1996?**

18    **A    Because my nursing manager assumed,**

19    **apparently, that I had taken drugs.**

20    **Q    Which nursing manager was that?**

21    **A    Jeanette Thompson.**

22    **Q    So that termination wasn't racially**

23    **motivated then, was it?**

24    **A    Yes, it was.**

25    Q    Oh, it was.  And you agreed to return to

1 a racially discriminatory working environment?

2    MR. ETOH: Objection. I don't know whether

3 there was a question pending, but the question is

4 compound. Asked the question, the witness did

5 not respond, another question followed. So which

6 one is the witness to respond to?

7    MR. VANDALL: It wasn't compound. I'll read

8 it again.

9    Q   You agreed to return to a racially

10 discriminatory working environment after 1996; is

11 that correct?

12   A   I didn't expect for it to continue to be

13 like that, no.

14   **Q   But you voluntarily chose to return to**

15 **an environment that you previously believed was**

16 **racially discriminatory; is that correct?**

17   **A   Yes.**

18   Q   An arbitration was commenced in 1996

19 regarding your termination at that time; is that

20 right?

21   A   Yes.

22   Q   And that was not completed, correct?

23   A   No, I don't understand your question.

24   Q   You settled rather than get an arbitral

25 award; is that correct?

1    A   No.

2    Q   Any alcohol problems?

3    A   No.

4    Q   Have you ever been to a drug and alcohol

5  rehabilitation center?

6    A   No.

7    Q   Have you ever taken a patient's morphine

8  or Demerol on the job?

9    A   No.

10    Q   Have you ever had someone accuse you of

11  taking a patient's morphine or Demerol on the job

12  after 1996?

13    A   Yes.

14    Q   Have you ever been found in an employee

15  area at Alta Bates Summit Medical Center wrapped

16  in a blanket shivering after not following

17  wasting procedures at Summit?

18    A   No.

19    Q   Never happened?

20    A   No.

21    **Q   Okay. Have you ever failed to follow**

22  **narcotic wasting procedures at Alta Bates Summit**

23  **Medical Center?**

24    **A   Yes.**

25    **Q   How many times?**

1    **A    A couple.**

2    **Q    Is that an important policy, narcotic**

3    **wasting procedures at Summit?**

4    **A    Yes.**

5    Q    How many times did you get away with it

6    when you weren't caught?

7    MR. ETOH:  Vague as to "getting away without

8    being caught," and that assumes facts not in

9    evidence.

10    BY MR. VANDALL:

11    Q    How many times?

12    A    Can you repeat your question?

13    Q    How many times did you get away with it

14    without being caught?

15    A    Get away with?

16    Q    Wasting without being caught, following

17    wasting procedures?  Not being caught?  Failing

18    to follow wasting procedures?

19    A    I haven't gotten away with anything.

20    Q    So the only times you've ever failed to

21    follow the wasting procedures you were caught at

22    Summit Medical Center; is that right?

23    A    I wouldn't use the term "caught."

24    Q    What term would you use?

25    A    I was aware and my manager was aware of

1   Q   Okay. You had mentioned earlier there

2   was more than one occasion when you failed to

3   follow the wasting procedure. What was the

4   substance of the second time?

5   A   I believe it was morphine.

6   Q   Another morphine --

7   A   I believe so.

8   Q   -- incident?

9   A   I believe so, but that's in the write-

10  up. In one of my write-ups.

11  Q   Well, I'm asking you about your

12  recollection.

13  A   I believe it was morphine.

14  Q   Okay.

15  A   Could have been -- I'm not sure, though.

16  **Q   Was there a third time?**

17  **A   It could have been. It could have been.**

18  **Q   Morphine again?**

19  **A   I'm not sure, you would have to look**

20  **through the write-ups.**

21  Q   Okay. In your complaint -- have you

22  reviewed the complaint that was filed against

23  Alta Bates Summit Medical Center in this case?

24  A   Yes.

25  Q   So you have seen that document.

1  that she had been terminated but that the letter

2  of termination was rescinded.

3      Do you see that statement?

4  A  Yes.

5  **Q  Did you ever see a letter of**

6  **termination?**

7  **A  No.**

8  **Q  You have no idea whether or not such a**

9  **letter of termination actually exists, right?**

10  **A  I do.**

11  **Q  How do you have that factual knowledge?**

12  **A  Because the union rep told me.**

13  Q  But you've never seen such a document?

14  A  No, I had never seen it.

15  Q  You have to let me finish asking my

16  questions.

17  A  Okay. Okay.

18  Q  Do you have any idea whether or not such

19  a letter exists?

20  A  Yes.

21  Q  Factually, you've actually seen

22  something yourself as opposed to hearsay?

23  A  Yes. I've seen something to -- I didn't

24  see the actual termination letter, but I saw

25  something in reference to that termination.

1    Q   What are you referring to?

2    **A   There is, I believe, a letter that human**

3    **resources had sent to the union rep, I think it**

4    **was Margie at the time, with plans to terminate**

5    **me.**

6    Q   You're just speculating, though, aren't

7    you?

8    A   No.

9    Q   Okay.  Do you have -- what factual

10   knowledge do you have?  What have you actually

11   seen that supports the statement that a letter of

12   termination was prepared regarding your

13   employment with Alta Bates Summit Medical Center

14   in 2003?

15   A   I didn't see a termination letter, but I

16   know that something exists.

17       Q   And what is the factual basis for

18   that knowledge?

19   A   Because the union rep told me that she

20   was going to fax it over to me and, apparently,

21   before she could do that, they rescinded it.

22   Q   Who was the union rep?

23   A   I believe at that time it was Margie

24   Marks.

25   Q   But you can't say for certain, can you?

1    A   Yes, I can.

2    **Q   Okay.  All right.  And other than Margie**

3    **Marks verbal statement, you have no documents in**

4    **your possession, custody or control that supports**

5    **that allegation in paragraph 12; is that right?**

6    **A   Not right now I don't.**

7    Q   What do you mean "not right now"?

8    A   I'm sure that I can get them.

9    Q   Have you made a reasonable good faith

10   effort to locate documents supporting the factual

11   statements contained in your complaint?

12   A   Yes.

13   Q   Okay.  And you provided those in the

14   500-some pages of documents you gave to your

15   attorney, correct?

16   MR. ETOH:  Objection.  Assumes facts not in

17   evidence.

18   MR. VANDALL:  The evidence is at the

19   beginning of the deposition testimony.

20   MR. ETOH:  She didn't say that she produced

21   500 documents to my office.

22   MR. VANDALL:  She said she gave you 500

23   documents.

24   MR. ETOH:  She said she reviewed over 500

25   documents, not gave them to me.

1    A   Documentation? No, I don't have any

2  documentation about the 1996, but I assumed that

3  it was wrongful because I was reinstated.

4    Q   So this is an actual fact?

5    A   I believe it is.

6    Q   It's based on speculation and

7  conjecture, though, isn't?

8    A   I don't know about law terms,

9  speculation and conjecture.

10    Q   It's a guess?

11    A   No. I was reinstated.

12    **Q   What's the factual basis for your**

13  **statement that the arbitrator found that the**

14  **termination was wrongful?**

15    **A   Because I was reinstated.**

16    Q   There's no finding, though, is there?

17    A   I think there is, I was reinstated.

18    Q   I think that speaks for itself.

19      How many other false statements do you

20  think are contained your complaint?

21    MR. ETOH: Objection.

22    MR. VANDALL: What's the objection?

23    MR. ETOH: Assumes facts not in evidence.

24    MR. VANDALL: That there are no false

25  statements contained in the complaint?

1  stated reason for the termination?

2  **A   I don't remember.  I don't remember.**

3  **Q   But you're sure it was racially**

4  **discriminatory?**

5  **A   I'm sure it was.**

6  **Q   But you have no factual basis for that,**

7  **including your own memory?**

8  **A   I don't remember.**

9  Q   Okay.  Are you in possession of any

10  documentary evidence that suggested that there

11  was a racial motivation underlying your December

12  2005 termination from Alta Bates Summit Medical

13  Center?

14  A   Not in any possession of any documents,

15  no.

16  Q   What is the factual basis of your belief

17  that your December 2005 termination from Alta

18  Bates Summit Medical Center was racially

19  motivated?

20  A   When I was -- when I was fired in

21  December of 2005, I was fired for working an

22  extra shift on my day off.  I know for a fact

23  that at least one other nurse had been called in

24  to come in on her day off and she agreed to work

25  on her unit only.  And when she didn't want to go

1  to another unit, she was sent home, she was not

2  fired. I know that it's a common practice that

3  we make deals with staffing on our day off to

4  work on our unit only. I know that for a fact.

5      So that for Jennifer to call me and

6  suspend me over the phone and say that staffing

7  don't have the right to make those deals, that

8  was not true and she knows it.

9  Q   How is that racially motivated?

10  A   Because I'm the only one fired.

11  Q   You weren't fired on November 20 or

12  21st, correct?

13  A   I was suspended. And believe me, that's

14  where they were going, because that's where they

15  went.

16  Q   So it's your speculation, then, that

17  Jennifer Stroud had a racial motivation?

18  A   Definitely.

19  Q   Do you have any factual basis supporting

20  that speculation?

21  MR. ETOH: I'm going to object to the use of

22  the word "speculation," that's vague.

23  BY MR. VANDALL:

24  Q   Other than what you've described, do you

25  have any factual support for your belief that

1 Jennifer Stroud had a racial motivation --

2  A  Yes.

3  Q  -- against you?

4  A  Yes.

5  Q  What is that, the factual basis?

6  A  All the suspensions.

7  Q  So, for example, you are being suspended

8 for failing to follow a morphine wasting policy

9 is -- provides factual support for your racial

10 discrimination claim; is that what your testimony

11 is?

12  A  I don't think I was suspended.

13  Q  Okay.  So it's only something that you

14 were suspended for?

15  A  I'm sorry.  What's your question?

16  Q  I'm trying to understand your claim.

17 You say that there's a discrimination --

18 discriminatory motive on Jennifer Stroud's part

19 against you?

20  A  Yes.

21  Q  And I've asked you to explain what that

22 is, and you've said all the suspensions?

23  A  Yes.  All the suspensions -- Jennifer

24 being white herself or Caucasian.  When any other

25 Caucasian person reports anything to Jennifer,

1 she automatically takes their side even if it's

2 two RNs with the same degree, she takes their

3 side, and then the hospital backs it up by

4 condoning that kind of activity.

5      They say that they investigated things,

6 and they don't investigate anything. It's just

7 the way that they want it to go.

8  Q  Are you finished?

9  A  Yes.

10  Q  Okay. Other than the suspensions that

11 you've mentioned, is there any other factual

12 support for your belief that Jennifer Stroud has

13 a racial motivation against you?

14  A  Factual support? Just with all the

15 suspensions.

16  Q  When did Jennifer Stroud start

17 supervising you?

18  A  I believe maybe 2005, I believe. I'm

19 not sure exactly.

20  Q  And before Jennifer Stroud began

21 supervising you in 2005, were you experiencing

22 discriminatory suspensions --

23  A  Yes.

24  Q  -- at someone else's hands?

25  A  Yes.

1 a writing that you review and sign off with other

2 representatives?

3    A   Yes.

4    Q   Okay.  And do you have the opportunity

5 to bring a union representative with you to those

6 meetings?

7    A   Yes.

8    Q   And sometimes you do and sometimes you

9 don't bring a union representative, correct?

10    A   Yes.

11    Q   Okay.  And you have an opportunity to

12 provide your own comments on those written

13 notices, if you so choose; is that correct?

14    A   Yes.

15    Q   Okay.  So when you do not provide

16 written comments, is there any reason for that

17 generally?

18    A   It all depends on the circumstances.  It

19 all depends on how busy I am, when I'm called

20 into the office.

21    Q   You mentioned earlier that there was one

22 other nurse who had agreed to work on her unit on

23 a day off and she was sent home rather than

24 fired; is that right?

25    A   Yes.

2    A    Paula Gann.

3    Q    Paula Gann?

4    A    Yes.

5    Q    She's one of your best friends at

6 Summit; is that right?

7    A    Actually, she's a very close coworker.

8    Q    What is her ethnicity?

9    A    I think she's American Indian.

10    Q    But you're not sure?

11    A    I believe she's American Indian.

12    **Q    Is there any other nurse that you can**

13 **identify who attempted to adhere to the floating**

14 **policy that you've described, which is to say**

15 **that they came in on their day off and had an**

16 **agreement not to float and were sent home --**

17    **A    No.**

18    **Q    -- or terminated?**

19        So it's only happened twice?

20    A    To my knowledge.

21    Q    Can you go back in your mind to the

22 night of November 20th, 2005, when you first

23 refused to float?  Do you remember that time

24 period?

25    A    I never refused to float.

1    Q    You didn't?

2    A    No.

3    Q    Okay. Tell me how it came to pass that

4    you were sent home for refusing to float?

5    A    Okay. So what happened was on the 20th

6    of November of 2005, the staffing coordinator, I

7    believe Felicia, called me at home and asked me

8    if I could come in on my day off, and I told her,

9    yes, but only for my unit and she agreed. And I

10    went in -- I believe that was at seven o'clock in

11    the evening. And Carol came in, I believe at

12    11:00, and she approached me and said, I need for

13    you to, I believe, go to five east.

14    Q    Your unit was four east, right?

15    A    Yes.

16    Q    Go on.

17    **A    And I told Carol I made a deal with**

18    **staffing that I would come in on my day off for**

19    **my floor only. And that's all I heard.**

20    Q    Okay. Do you have any idea what was

21    going on in five east, why they needed staffing?

22    A    No. I have no idea.

23    Q    What are the general reasons why someone

24    would need to float from four east to five east;

25    do you have any idea?

1    A   Yes.

2    Q   And you did not float to five east?

3    A   I did not float to five east.

4    Q   Okay.  Was there a second time that you

5  were asked to float to five east before you were

6  suspended or was that the only time?

7    A   No, there was a second time.

8    Q   Okay.  What was the date of the second

9  time you were asked to float to five east?

10   A   November 21st.

11   Q   The very next day?

12   A   Yes.

13   Q   Was it on the same shift into the night

14  or was it the next day, a different shift?

15   A   Next day.  Different shift.

16   Q   Different shift?

17   A   Yes.

18   Q   Were you also on your day off that day?

19   A   Yes.

20   **Q   And you were also called in to float**

21  **that day or called in to work a shift that day?**

22   **A   Yes.**

23   Q   Okay.  And who asked you -- what time of

24  day was that?

25   A   When they called?

1  Q  So you didn't actually speak with her

2  directly?

3  A  No.

4  Q  Okay.  So the second time you were asked

5  to float, who asked you to float to five east?

6  A  Carol.

7  Q  And what was your response?

8  A  I told her, I said, Carol, just like

9  last night, I made a deal with staffing to come

10  in on my day off for my unit only.

11  Q  So you refused to float?

12  A  I didn't refuse to float.

13  Q  What else would you call it?

14  A  I made a deal with staffing.

15  Q  You were asked to float and you said no,

16  right?

17  A  No, I never said no.

18  Q  If they had asked you again, would you

19  have done it?

20  A  If I made a deal with staffing to come

21  in on my off for my unit only, because that's

22  what we all do at Summit, not just on four east,

23  and if -- the problem is if it was a problem the

24  first night and Carol would have said something

25  the first night, there would not have been a

1 to pop up on the schedule.

2   Q   You knew you weren't working there,

3 right?

4   A   Yeah.

5   Q   So you didn't think reasonably that you

6 were possibly going to now be employed by Summit

7 Medical Center?

8   A   Well, actually, I did.  I thought maybe

9 because the deposition was coming and that maybe

10 it was a possibility that they were going to

11 offer me my job back, and that's why they had put

12 me on the schedule.  That's honestly what I

13 thought.

14   Q   And you quickly discovered that wasn't

15 true, correct?

16   A   Well, no, not really.  Nobody has called

17 yet.

18   Q   Other than your friends, did you ever

19 contact a single person in a position of

20 authority at Summit Medical Center to inquire

21 about whether you were being given your job back?

22   A   Oh, no.

23   Q   No, you didn't, did you?

24   A   No.

25   Q   Okay.  So you didn't have a reasonable

1  basis for your belief that you were being

2  harassed?

3    A   Oh, I did.

4    Q   And the harassment, if I'm correct in

5  understanding, is that you were going to be

6  getting your job back?

7    A   That's what I thought.

8    Q   And that was harassing to you?

9    A   Yes.

10    Q   Okay. I understand that one.

11        Do you have any other examples of

12  alleged discriminatory harassment that you

13  experienced at Alta Bates Summit during the

14  2004/2005 time period?

15    A   What, another suspension?

16    Q   Other than the suspensions, we are going

17  to talk about those.

18    A   Okay. Just all of the suspensions and

19  the termination, no, I don't believe so.

20    Q   Have you ever learned from any source

21  that any verbal comment from Alta Bates Summit

22  Medical Center was based upon your race, color or

23  national origin?

24    A   No.

25    Q   Have you ever personally heard anyone at

1 **Alta Bates Summit Medical Center make any jokes**

2 **that you believe were based on race, color or**

3 **national origin?**

4 **A   No, not that I can remember right now.**

5 **Q   Yes or no?**

6 **A   Not that I can remember right now.**

7    Q   Have you ever made any verbal comments

8 at Alta Bates Summit Medical Center based upon

9 race, color or national origin?

10    A   No.

11    Q   Has anyone ever accused you of doing so?

12    A   No.

13    Q   Never made a single comment to anyone

14 about your belief that Caucasians treat African-

15 Americans differently?

16    A   Oh, yes.  Oh, yes.

17    Q   Okay.

18    A   Oh, yes.

19    Q   So how many of those verbal comments

20 based upon race, color or national origin have

21 you made?

22    A   Every time I was suspended or -- yeah,

23 or fired.

24    Q   Every time you were suspended or fired

25 by Alta Bates Summit Medical Center, you

00134

1  based; tell me what the comments were.

2  A  That I was being treated unfairly.

3  Q  What derogatory comments?  Do you

4  understand the term "derogatory comments"?  Did

5  you call anyone a name --

6  A  No.

7  Q  -- that was racially motivated?

8  A  No.

9  Q  Did you use any racial-based slurs or

10  epithets --

11  A  No.

12  Q  -- towards other people --

13  A  No.

14  Q  -- when you were being suspended or

15  terminated?

16  A  No.

17  Q  Any other type of derogatory or negative

18  comment that was racially based that you've made

19  towards any other employees at Summit?

20  A  No.

21  Q  And no one has made such comments to

22  you, right?

23  A  No. Right.

24  Q  Have you ever learned from any source of

25  any jokes being made at Alta Bates Summit Medical

1 Center based on race, color or national origin?

2    A   No.

3    Q   Have you ever made any joke based on

4 race, color or national origin at Alta Bates

5 Summit Medical Center?

6    A   No.

7    Q   Has anyone ever accused you of doing so?

8    A   Not that I can recall.

9    Q   Have you ever personally heard anyone at

10 Alta Bates ever use an epithet or call someone a

11 derogatory name that you believe was based on

12 race, color or national origin?

13    A   Anybody at Summit?  Not that I can

14 recall.

15    Q   Okay.  Have you ever learned from any

16 source of the use of epithets or derogatory names

17 based on race, color or national origin at Alta

18 Bates Summit Medical Center?

19    A   Not that I can recall.

20    Q   Thank you.  Have you ever personally

21 seen any writings or drawings at Alta Bates

22 Summit Medical Center that you believe were based

23 on race, color or national origin?

24    A   Not that I can recall.

25    Q   No?  Yes or no?

1   A   **Not that I can recall, right now.  I**

2   **can't say yes or no because I don't really**

3   **remember right now.**

4   Q   Have you ever learned from any source of

5   any writing or drawing at Alta Bates Summit

6   Medical Center based upon race, color or national

7   origin?

8   A   Not that I can recall.

9   Q   Have you ever, at Summit Medical Center,

10   made or brought into the workplace any writings

11   or drawings based on race, color or national

12   origin?

13   A   No.

14   Q   Have you ever been accused of doing so?

15   A   No.

16   Q   Is there any other statement or action

17   of which you're aware that occurred at Alta Bates

18   Summit Medical Center that you believe was based

19   upon race, color or national origin?

20   A   Other than the suspensions?  Can you

21   repeat the question?

22   Q   Is there any other statement or action

23   of which you're aware that occurred at Alta Bates

24   Summit Medical Center that you believe was based

25   upon race, color or national origin?

1    A   Yes.

2    Q   What?

3    A   When I was suspended for being accused

4  of chasing someone.

5    Q   What year?

6    A   I'm sorry?

7    Q   What year was that?

8    A   I believe it was 2004 or '5.

9    **Q   Okay. Other than the suspensions and**

10 **performance discipline history from 2004/2005,**

11 **which we'll talk about, has there ever been any**

12 **other statement or action of which you're aware**

13 **that occurred at Alta Bates Summit Medical Center**

14 **that you believe was based upon race, color or**

15 **national origin?**

16    **A   No.**

17    MR. ETOH: Counsel, I was wondering when we

18 can all take a ten-minute break?

19    MR. VANDALL: Can we do five minutes, and

20 then take a lunch break at noonish? Is that okay

21 with you?

22    THE VIDEOGRAPHER: The deposition of

23 Charlotte Kirton. This marks the end of Video

24 Disc Number 2. The time is 11:03. We are off

25 the record.

1 is Caucasian?

2    A    Okay.

3    Q    So all of these agreements to float are

4 being made allegedly with minorities and

5 Caucasians alike; is that correct?

6    A    The agreement to float?

7    Q    Or not to float?

8    A    Agreements are made with everybody.

9    Q    The policies that you claim are at issue

10 in four east are applied non-discriminatorily to

11 Filipinos, American Indians, African-Americans

12 and Caucasians alike; is that right?

13    MR. ETOH:  Objection.  Calls for a legal

14 conclusion.

15 BY MR. VANDALL:

16    Q    Based on your personal knowledge, people

17 that you've identified.

18    A    Okay.

19    **Q    The policy that you've explained that's**

20 **being applied to Filipinos, Caucasians, American**

21 **Indians and African-Americans, correct?**

22    **A    The policy of floating?**

23    **Q    The very one that you've described today**

24 **that you participated in conversations with**

25 **nurses requesting --**

1    **A    Yeah.  Everybody makes deals to float.**

2    **Nobody gets terminated for those deals.**

3    **Q    Regardless of race?**

4    **A    Yeah.  Everybody makes deals to float.**

5    Q    Who is Sarah Quismondo?

6    A    Sarah is a staffer at Summit.

7    Q    Is she at Summit or the Alta Bates

8    Campus?

9    A    When I was there, she was at Summit.  I

10   think she might have floated to Alta Bates to

11   staff as well.

12   Q    Was she in four east?

13   A    She's a staffer, they are in the

14   staffing office.

15   Q    You'll have to explain to me what the

16   difference is.

17   A    Yeah.  A staffer is located in the

18   staffing office, and they are there to staff the

19   needs of the hospital.  Four east is renal

20   metabolic unit where patients are housed

21   and there's no nurses to take care of them.

22   Q    Is Sarah Quismondo a social acquaintance

23   of yours?

24   A    No.

25   Q    How did you first meet?

1    A    I told her I come in on the 20th on my

2  day off, made a deal with staffing.  Then I came

3  in on the next day, made a deal with James in

4  staffing, and I was sent home.

5    Q    I'm talking specifically.  I just want

6  to make sure we are on the same page about your

7  conversation with Jennifer Stroud on November

8  28th, 2005, the content of that conversation.

9    A    That's what I'm saying.

10    Q    Okay.  I just wanted to make sure.

11    A    Okay.  Yeah.  I told her I came in on

12  the 20th because I made a deal with staffing to

13  work on four east and then again on the 21st, and

14  that's when Ceann sent me home.  And it wasn't a

15  very lengthy conversation.  I believe that's the

16  extent of it.

17    Q    So you have provided me with the sum and

18  substance of the telephone conversation that you

19  had with Jennifer Stroud regarding your

20  suspension in November of 2005; is that correct?

21    A    Yes.

22    Q    **Is it fair to say that the harassing**

23  **behavior that she engaged in was to hang up the**

24  **phone?**

25    A    **She hung up in my face.  That wasn't**

1 acceptable for a manager. She hung up in my

2 face. She lied saying we don't make those kind

3 of deals. Her tone was not acceptable for a

4 manager. And, yes, to me, that was harassing.

5   Q  Was there anything that she said that

6 indicated that she had a racial motivation?

7   A  No.

8   Q  So basically she was short with you on

9 the phone. Short and you didn't appreciate her

10 tone and she hung up the phone before you were

11 finished speaking; is that the sum and substance

12 of the harassment claim against Jennifer Stroud

13 with respect to this call?

14   A  Yes. Very rude.

15   Q  Did you have any other telephone calls

16 with Jennifer Stroud after that one?

17   A  No, not that I can recall. No. I

18 recall -- no.

19   Q  Is there anything else that you can

20 think of or recall about that telephone

21 conversation, other than what you've already

22 testified to?

23   A  No, not that I can recall.

24   Q  What is your national origin?

25   A  What race am I?

1    Q   What is your national origin?

2    A   Can you just be a little more clear with

3 that question?

4    Q   What is your national origin?

5    A   It's the same question?

6    Q   Yes, I understand.

7    A   You mean my race?

8    Q   I've asked you what is your national

9 origin. Can you answer that question?

10    MR. ETOH: Object as to being vague as to the

11 term "national origin."

12    MR. VANDALL: I can't even begin to wonder

13 how the term "national origin" is vague in the

14 context of this case.

15    THE WITNESS: I just want to know what you

16 mean, sir.

17 BY MR. VANDALL:

18    Q   You have filed a lawsuit based on

19 discrimination stemming from your national

20 origin. Can you tell me what your national

21 origin is?

22    A   I can tell you my race is African-

23 American.

24    **Q   So your lawsuit, then, has nothing to do**

25 **with your national origin, it's solely related to**

00185

1  your race, African-American; is that correct?

2  A  I don't understand what you say when you

3  say "national origin"?

4  Q  Can you refer to Exhibit 200, please?

5  A  Okay.

6  Q  That's the complaint in this case.

7  Would you turn to page 12 of 14?

8  A  Okay.

9  Q  Do you see the line 19 that says

10  "Seventh Cause of Action"?

11  A  Yes.

12  Q  Underneath that line it says, "For

13  harassment based on race and national origin."

14  Do you see that?

15  A  Yes.

16  Q  Does that help you understand what

17  national origin is?

18  A  Yes.  My race.

19  Q  Okay.  So there's no distinguishment in

20  your mind between race and national origin; is

21  that correct?

22  A  Not in my mind.  That's correct.

23  Q  But there's no -- so there's no evidence

24  of someone discriminating against you based on

25  the country that you're from?

1    A    No, I think it's just my race.

2    Q    Okay.  Do you contend that you've been

3    treated less favorably than other African-

4    American employees at Summit Medical Center?

5    A    Less favorably than other African-

6    American employees?  No, I -- can I answer, like,

7    with a follow-up with a no?

8    Q    I can ask you a follow-up.

9    A    Okay.

10    Q    Did you have a follow-up?

11    A    Yes.  I believe that Summit Alta Bates

12    discriminates against African-Americans.

13    Q    What is the factual basis for that

14    statement, as applied to you?

15    A    Well, in that they didn't hire a lot of

16    black -- a lot of African-Americans, number one.

17    And the ones that they do hire, they harass

18    them.  They fire them.  And it's just not

19    happening with the other Filipinos or the white

20    people.  It's just not happening.

21    Q    So my question, though, and we'll get

22    back to those points that you're making, was

23    whether or not you're treated less favorably than

24    other African-American employees at Summit

25    Medical Center.  You said no, then you wanted to

1 answer your question, I think that they got to

2 keep a few black people there.  Can't go firing

3 everybody, although they have managed to almost

4 do that.  I just -- I think that's the answer to

5 your question.

6      Why?  Because -- I don't know.  I don't

7 know why.  I wish I knew why.

8    **Q    Okay.  Do you contend that you've been**

9 **treated less favorably than Hispanic nurses at**

10 **Summit Medical Center?**

11    **A    Less favorably?**

12    **Q    Yes.**

13    A    The Hispanic nurses have been treated

14 better than me?

15    Q    I'll ask my question again.

16      Do you contend that you have been

17 treated less favorably than Hispanic nurses at

18 Summit Medical Center?

19    A    Yes.

20    Q    Why do you believe that you've been

21 treated less favorably than Hispanic nurses at

22 Summit Medical Center?

23    A    Because I know that there are Hispanic

24 nurses there, and they are not being treated the

25 way that I've been treated.

1    A    No.

2    **Q    So you have no personal knowledge of**

3    **their disciplinary history; is that correct?**

4    **A    No. I talked to Hispanic nurses there.**

5    **Q    You would have no way of knowing one way**

6    **or the other whether or not they are telling you**

7    **the truth based on their actual personnel**

8    **history; is that correct?**

9    **A    No.**

10    Q    And do you contend that you've been

11    treated less favorably than Filipino nurses at

12    Summit Medical Center?

13    A    Yes.

14    Q    Do you have any personal knowledge of

15    the personal disciplinary histories of any of the

16    Filipino nurses at Summit Medical Center?

17    A    No.

18    Q    Okay. And is your testimony that you've

19    been treated less favorably than the Filipino

20    nurses based on anything other than your

21    disciplinary history including your termination?

22    A    I'm treated less favorably, right,

23    that's the question?

24    Q    Right. I've been asking the same set of

25    questions several times now. You're

1 understanding the question, right?

2    A    I've been treated less than them?

3    Q    Less favorably?

4    A    Less favorably?

5    Q    You testified earlier that the

6  differential treatment was based on your

7  disciplinary history?

8    A    Yes.

9    Q    Okay.  That's what I'm asking you about.

10    A    Okay.

11    Q    Have you been treated less favorably

12  than Filipino nurses for the same reasons?

13    A    Yes.

14    Q    Okay.  And you have no personal

15  knowledge of what their disciplinary histories

16  are, correct?

17    A    I have no personal knowledge except for

18  what they tell me.

19    Q    Okay.  And same questions with respect

20  to American Indian nurses, I think that was the

21  phrasing that you used.

22    A    Okay.

23    <u>Q    Do you have any -- do you contend that</u>

24  <u>you're treated less favorably than American</u>

25  <u>Indian nurses at Summit Medical Center?</u>

1    A   Yes.

2    Q   And is that also based on your

3 disciplinary history as we have been describing

4 it?

5    A   My disciplinary history and my race.

6    Q   Right.  But your race is the reason you

7 believe that you received this disciplinary

8 history, correct?

9    A   Yes.  Yes.

10    Q   And you believe that you were treated

11 less favorably than American Indian nurses based

12 on that disciplinary history, correct?

13    A   Yes.

14    Q   And you have no personal knowledge of

15 the disciplinary history of any of the American

16 Indian nurses at Summit Medical Center; is that

17 correct?

18    A   Other than what they tell me.  The only

19 one that's there is Paula.

20    Q   And you have no personal knowledge,

21 correct?

22    A   Only what she tells me.

23    Q   Do you have personal knowledge of what

24 her personnel file contains?

25    A   No.

1 Thank you. Do you contend that you've

2 been treated less favorably than any other group

3 of employees at Summit Medical Center; Caucasian,

4 Chinese-American, Chinese, any other race or

5 ethnicity?

6    A   Caucasians. I'm treated less favorably.

7    Q   And that is also based on your

8 disciplinary history, correct, as we have been

9 describing it?

10    A   Yes.

11    Q   Okay. And do you have personal

12 knowledge of the disciplinary history of any

13 Caucasian nurse at Summit Medical Center?

14    A   No personally.

15    Q   Okay. Are there any other races or

16 ethnicities at Summit Medical Center that you

17 contend you were treated less favorably than,

18 that we haven't discussed?

19    A   Treated less favorably? I'm treated

20 less favorably than everybody.

21    Q   You are the most unfavorably treated

22 nurse at Summit?

23    A   Yes, I believe so.

24    Q   Okay. And that's all based on your

25 disciplinary history, correct?

00197

2     MR. VANDALL:  Okay.  I'm going to hand the

3  court reporter a two-page document to be marked

4  as Exhibit 300 to your deposition transcript.

5    (Exhibit 300 was marked for identification.)

6  BY MR. VANDALL:

7     Q    Do you have the document in front of

8  you?

9     A    I do.

10    Q    Do you recognize it?

11    A    Yes.

12    Q    Have you ever seen this document before?

13    A    Yes.

14    Q    Were you asked to sign it?

15    A    No.

16    Q    You weren't asked to sign it?

17    A    No.

18    Q    Okay.

19    A    They sent this to me in the mail.

20    Q    Okay.  The reason for disciplinary

21  action that is stated on Exhibit 300 is, and I'll

22  read this into the record, "On November 20, 2005,

23  you were working an extra shift on four east.  It

24  was necessary for an RN to float to another unit

25  and since it was your turn to float and you were

 1  working an extra shift, you were ~~instructed~~ to

 2  float to five east.  You flatly refused to

 3  float."

 4      Do you see that?

 5   A   Yes.

 6   **Q   Do you disagree with those statements?**

 7   **A   Yes.**

 8   **Q   Which statement do you disagree with?**

 9   **A   It wasn't my turn to float because it**

10  **wasn't my regular day to work.  I was off on that**

11  **day.**

12   Q   Any other statements?

13   A   I wasn't instructed to float.  Well,

14  maybe I was.  She -- Carol did say that -- I

15  think she -- I don't know if she asked me to go

16  to five east, but I think she said somebody had

17  to float to five east.  So I'm not sure if I was

18  instructed or she said somebody had to float.

19  I'm not sure.

20   Q   Okay.

21   A   And I flatly refused.  That's a lie.

22   Q   Based on what you've previously

23  testified to, meaning you said that you adhered

24  to your agreement with the staffing office that

25  you didn't have to float?

1  A  Oh, I don't think I would ever do

2  anything like that.

3  Q  Never?

4  A  Never.

5  Q  If you did, would it be worthy of

6  writing up a formal warning?

7  A  If I did.

8  Q  And that wouldn't be racially based

9  either, right?

10  A  No.

11  Q  Isn't it true that any and all

12  discriminatory conduct by Alta Bates Summit

13  Medical Center which you claim was directed

14  towards you stopped occurring in in December

15  2005 when you were terminated?

16  A  Can you repeat the question, please?

17  Q  Isn't it true that any and all the

18  discriminatory conduct by Alta Bates Summit

19  Medical Center, which you claim was directed

20  towards you, ended in December 2005 when you were

21  terminated?

22  MR. ETOH: Objection. Compound.

23  THE WITNESS: So the -- can you just --

24  BY MR. VANDALL:

25  Q  Once you were terminated in December of

1 2005, Alta Bates Summit Medical Center was no

2 longer discriminating against you, right?

3    A   Right.  Right.

4    Q   And once you were terminated in December

5 of 2005, Alta Bates Summit Medical Center was no

6 longer harassing you on the basis of your race,

7 correct?

8    A   Correct.

9    Q   Do you have reason to believe that

10 anyone in Alta Bates Summit Medical Center

11 supervision or management was aware of any

12 statements or conduct in the workplace that you

13 believe was based upon race, national origin or

14 color?

15    MR. ETOH:  Objection.  Compound.

16 BY MR. VANDALL:

17    Q   Okay.  Do you have any reason to believe

18 that anyone in Alta Bates Summit Medical Center

19 supervision was aware of any statements or

20 conduct in the workplace that you believe was

21 based upon race?

22    MR. ETOH:  Objection.  Vague as to "anyone,"

23 and vague as to time.

24    THE WITNESS:  Can you ask one more time,

25 please?  I'm sorry.

1    Q    How does that relate to your

2  discrimination claim?

3    A    So they take -- I mean, I don't know if

4  you can imagine working someplace for ten, 15, 20

5  years.

6    Q    29 years, right?

7    A    Well, no, I didn't work there for 29

8  years.

9    Q    That's what you said earlier.

10  Physically at a Summit-related hospital for 29

11  years.

12    A    I said I worked at Summit through the

13  Registry for approximately ten years prior to

14  taking a staff position. So I've been working

15  through the Registry and on staff the entire, my

16  entire nursing career starting as a nurse aide

17  ,did my training there as an LVN, and then as an

18  RN. That's what I said.

19    Q    Is there anything else you would like to

20  add?

21    A    So you can ask that question over,

22  please.

23    **Q    And you believe those promotions are**

24  **evidence of Summit favoring white employees over**

25  **black employees?**

1    A    Yes.

2    Q    Did you have something that you wanted

3    to add?

4    A    Yeah.  What I was going to say was you

5    -- I've been there -- I was at Summit for -- at

6    the time, for 13 years, 14 years, something like

7    that, on staff as a registered nurse.  And then

8    they came and brought the Caucasian travelers and

9    put them over the regular staff.  That created

10    problems with the regular staff and especially

11    with the white Caucasian and the black RN, me.

12    Q    Did you complain about that to anyone?

13    A    Yes.

14    Q    Who?

15    A    When I got wrote up with this Colleen

16    thing in one of these.  I talked to my union,

17    that's why we were filing a grievance.

18    Q    In what year?

19    A    Let me see, when was it that this

20    Colleen thing, because there's so many write-ups

21    here?  So the union was supposed to file the

22    grievance on this Exhibit 600.  They were

23    supposed to file a grievance on that.  They were

24    supposed to file a grievance on Exhibit 700 in

25    reference to the race thing.

1  like floating and a grievance procedure, correct?

2  A   Yes.

3  Q   Are you aware of Summit Medical Center's

4  policies prohibiting discrimination and

5  harassment in the workplace?

6  A   Is that here in the book?

7  Q   I'm not asking about Exhibit 1000. I'm

8  just asking you generally if you're aware of

9  Summit Medical Center's policies prohibiting

10  discrimination and harassment in the workplace?

11  A   I would like to see a copy of it.

12  Q   Are you aware that such policies exist?

13  A   I believe they do.

14  Q   When and how did you become aware of

15  those policies?

16  A   Well, it's a business, they should

17  exist, I mean.

18  Q   Were they in writing, did you ever see

19  them, did you ever --

20  A   I'm sure that I did. I don't really

21  remember, but I'm sure that I did.

22  **Q   Did you ever attend a training in which**

23  **discrimination and harassment was discussed?**

24  **A   I'm sure that I did.**

25  **Q   Okay. And at those trainings, it was**

1 **expressed that discrimination and harassment are**

2 **not tolerated at Alta Bates Summit Medical**

3 **Center, generally; is that right?**

4 **A   I'm sure that it was.**

5 **Q   You have no reason to recall that such a**

6 **training didn't occur, right?**

7 **A   I believe they occurred.**

8 **Q   At both the supervisory level and the**

9 **staff level?**

10 **A   I'm only just the staff so --**

11 **Q   Only what you have personal knowledge**

12 **of?**

13 **A   I believe they did.**

14 **Q   Okay.  That's fair.  Thank you.  And you**

15 **received copies of Alta Bates Summit Medical**

16 **Center's policies regarding discrimination,**

17 **harassment and other general policies; is that**

18 **right?**

19 **A   Yes.**

20 **Q   You would have signed off on those**

21 **policies in your personnel file, right?**

22 **A   Yes.**

23 Q   Do you know how long ago you received

24 training regarding discrimination and harassment

25 at Alta Bates Summit Medical Center?

1 complaint, Exhibit 200, it's on page 6 of 14?

2    A    Page 6?

3    Q    Six of 14.

4    A    Okay.

5    Q    Paragraph 30?

6    A    Okay.

7    Q    The line says, "Defendant took no

8 appropriate action against the offending

9 employees."

10      Do you see that?

11    A    Yes.

12    Q    As you sit here today, you have no

13 personal knowledge one way or the other about

14 whether any actions taken against the offending

15 employees; isn't that right?

16    A    I don't know who you're in reference to.

17    Q    It's your complaint, who are you

18 referencing?

19    A    "Defendant took no appropriate action

20 against the offending employees." I guess that

21 would be Jennifer. I guess that would be Ceann.

22 No, I didn't do anything. I mean --

23    Q    **I'm not asking if you did anything. As**

24 **you sit here today, you have no personal**

25 **knowledge one way or another whether or not Alta**

1  Bates Summit Medical Center took any action

2  against the, quote, "offending," unquote,

3  employees; is that right?

4     A   The offending employees meaning

5  Jennifer?

6     Q   Correct. Do you have any knowledge one

7  way or the other whether any action was taken

8  against Jennifer Stroud?

9     A   No.

10    Q   Do you have any knowledge one way or the

11  other whether any action was ever taken against

12  Ceann McNamara?

13    A   No.

14    Q   Do you have any knowledge one way or the

15  other whether any action was taken against

16  Carol Grappo?

17    A   No.

18    Q   Are there any other employees that you

19  would describe as within the definition of the

20  offending employees as you mean that term in

21  paragraph 30?

22    A   In reference to this last termination?

23    Q   In reference to the allegations of your

24  complaint.

25    A   Because Laura Gilletch was included in

00274

1 the offending employees.

2   Q  But she's no longer there?

3   A  Oh, I don't know that.

4   Q  Is she or isn't she?  Okay.  Do you have

5 any personal knowledge of whether or not any

6 action was taken against Laurel Gilletch?

7   A  No.

8   Q  Are there any other employees?

9   A  No.

10   Q  Okay.  So we covered the sum and

11 substance of your allegation in paragraph 30?

12 There's no factual basis for that statement, is

13 there?

14   A  I don't understand your question.

15   Q  My question is:  There's no factual

16 basis for paragraph 30, correct?

17   A  I still don't understand your question.

18   Q  Okay.  I think you've answered the

19 question.

20     Have we discussed all of the conduct and

21 comments which you contend were racially

22 discriminatory?

23   A  No.

24   Q  What have we not discussed?

25   A  The conduct that was racial and

1    STATE OF CALIFORNIA        )

2    COUNTY OF SONOMA           )

3         I, LINDA VACCAREZZA, a Certified Shorthand

4    Reporter of the State of California, duly

5    authorized to administer oaths pursuant to

6    Section 2025 of the California Code of Civil

7    Procedure, do hereby certify that

8                   CHARLOTTE KIRTON,

9         The witness in the foregoing examination,

10   was by me duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the

12   within-entitled cause; that said testimony of

13   said witness was reported by a disinterested

14   person, and was thereafter transcribed under my

15   direction into typewriting and is a true and

16   correct transcription of said proceedings.

17        I further certify that I am not of counsel

18   or attorney for either or any of the parties in

19   the foregoing examination and caption named, nor

20   in any way interested in the outcome of the cause

21   named in said caption.

22        Dated the 2nd day of April, 2008

23        _Linda Vaccarezza_

24        LINDA VACCAREZZA, RPR, CSR #10201

25

                                                    291

1    I, Danielle M. Ellis, declare:

2        1.    I am an associate with the law firm of Kauff, McClain & McGuire,

3    LLP, attorneys of record for Defendants Alta Bates Summit Medical Center, in the

4    above-captioned matter. I have personal knowledge of the facts stated in this

5    declaration and, if called as a witness, would be competent to testify thereto.

6        2.    Attached hereto as **Exhibit A** is the relevant deposition testimony of

7    Plaintiff Charlotte Kirton submitted in support of Defendant's motion for summary

8    judgment or, in the alternative, partial summary judgment.

9        I declare, under penalty of perjury under the laws of the United States of

10   America that the foregoing is true and correct.

11       Executed this ___ day of April, 2008 at San Francisco, CA.

12                                    /S/
                                  DANIELLE M. ELLIS

13   4853-3061-7090.1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-1-